# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
### Southern Division

| | | |
|---|---|---|
| **ENOCH T. WILSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. CBD-10-1018 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| Commissioner, Social Security | ) | |
| Administration | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Enoch Wilson, ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433. Before the Court are Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") and Commissioner's Motion for Summary Judgment ("Commissioner's Motion") pertaining only to Plaintiff's second application for DIB.[1] The Court has reviewed said motions and the applicable law. No hearing is deemed necessary. Local Rule 105.6 (D. Md.). For the reasons presented below, the Court hereby DENIES Plaintiff's Motion and GRANTS Commissioner's Motion.

### I. Background

Plaintiff filed an application for DIB on November 5, 2007, alleging disability from

---

[1] Plaintiff initially filed for SSI on May 2, 2007 and DIB on May 26, 2007. (R. 123-28). Plaintiff's SSI application was denied on May 2, 2007 because his "countable income exceeds Title XVI payment amount." (R. 136). Plaintiff's first DIB application was denied in July of 2007. (R. 136). Plaintiff did not appeal either of these decisions but instead reapplied for DIB on November 5, 2007, which serves as the basis for the instant matter.

March 1, 2003. (R. 14, 129). This DIB claim was denied initially and upon reconsideration. (R. 14). On May 8, 2009, Plaintiff testified at an administrative hearing, held before an Administrative Law Judge ("ALJ"), in Washington, D.C. (R. 14). Subsequently, another hearing was held on August 11, 2009, for the purpose of obtaining testimony from a vocational expert ("VE"), who was unavailable at the first hearing. (R. 30). Plaintiff did not attend the second VE hearing. While Plaintiff was represented by counsel at both hearings, counsel has since withdrawn her appearance. (R. 24). In Plaintiff's Motion, he explains that since the last hearing he has parted with ways with the law firm previously representing him. While this is not reflected in the record, the Court assumes that Plaintiff is proceeding pro se for the purposes of the instant matter.

On September 16, 2009, the ALJ determined in a written decision that Plaintiff was not "under a disability, as defined in the [Act], at any time from March 1, 2003, the alleged onset date, through September 30, 2008, the date last insured (20 C.F.R. 404.152(g)) or for that matter through the date of this decision." (R. 23). The ALJ found that Plaintiff's date last insured ("DLI") was September 30, 2008. (R. 16). Plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on March 11, 2010, making the ALJ's decision final and appealable. (R. 1-3).

## II. ALJ's Decision

The ALJ evaluated Plaintiff's claim using the five-step sequential process set forth in 20 C.F.R. §§ 404.1520. At the first step, the ALJ determined that Plaintiff has not engaged in substantial gainful activity ("SGA") "during the period from his alleged onset date of March 1, 2003 through his date last insured of September 30, 2008." (R. 16). At the second step, the ALJ determined that Plaintiff has the following severe impairment: "posttraumatic arthritis of the

2

right ankle." (R. 16). At the third step, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (the "Listings"). (R. 16). Next, the ALJ determined Plaintiff's residual functional capacity ("RFC") (R. 17), which will be discussed in greater detail below. The ALJ concluded that Plaintiff was not under a disability, as defined by the Act from March 1, 2003 through September 30, 2008. (R. 23).

### III. Standard of Review

The role of this Court is to determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standards. 42 U.S.C. §405(g); Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). It is more than a scintilla, but less than a preponderance, of the evidence presented. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Johnson v. Califano, 434 F. Supp. 302, 307 (D. Md. 1977). The Court's role is a limited one within the Act. Freeman v. Harris, 509 F. Supp. 96, 99 (D.S.C. 1981). Thus, ordinarily if there is substantial evidence to support the decision of the Commissioner, then that decision must be upheld. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986). This Court cannot try the case de novo or resolve evidentiary conflicts, but rather must affirm a decision supported by substantial evidence. Id.

The Court must also determine whether the Commissioner followed correct procedures. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard

3

or misapplication of the law." Coffman, 829 F.2d at 517. After review, the Court has the power to affirm, modify, or reverse the decision of the Commissioner, with or without remanding the case for rehearing. 42 U.S.C. § 405(g); Virek v. Finch, 438 F.2d 1157, 1158 (4th Cir. 1971).

Finally, it must be noted that hearings on applications for Social Security disability entitlement are not adversary proceedings. Easley v. Finch, 431 F.2d 1351 (4th Cir. 1970). Moreover, the Social Security Act is a remedial statute and it is to be broadly construed and liberally applied in favor of beneficiaries. Dorsey v. Bowen, 828 F.2d 246 (4th Cir. 1987). A claimant is entitled to a full and fair hearing and failure to have such a hearing may constitute sufficient cause to remand the case. Sims v. Harris, 631 F.2d 26 (4th Cir. 1980).

## IV. Analysis

At the onset, Plaintiff's Motion[2] includes letters from various persons purportedly for the purpose of verifying Plaintiff's "level of comprehension." (Pls. Mot. 2). Generally, the Court can only consider those things that are apart of the administrative record. Flores v. Heckler, 755 F.2d 401, 403 (5th Cir. 1985) ("The governing statute, 42 U.S.C. § 405(g) . . . only authorizes review of the pleadings and the record. As we have noted, district courts in § 405(g) cases may not consider evidence outside the administrative record . . . ."). Plaintiff does not proffer any argument – nor is there evidence – that the letters attached are new materials or related to the time period in question. Therefore the Court cannot and has not considered them.

Before examining the merits of Plaintiff's Motion, a brief overview of Plaintiff's relevant work history is provided. Plaintiff worked as a corrections officer at the Lorton Correctional Complex ("Lorton Prison"), in Lorton Virginia, from 1987 to 1997. (R. 147). In 1993, Plaintiff

---

[2] More accurately is "Plaintiff's pro se letter" or "plea to the court." While it may lack many of the stylistic and substantive features of a typical summary judgment motion, the Court will attempt to extract Plaintiff's relevant arguments where possible. The Court will not speculate or make attempts to determine what Plaintiff's intent is, unless such is clear.

4

suffered a serious injury from being hit on the side of a road in 1993. (R. 251). Following the accident, Plaintiff returned to work after approximately a year and a half. (R. 46). According to Plaintiff, after the Lorton Prison was shutdown, he subsequently "accepted a job as a [m]emorial [c]ounselor at Fort Lincoln Cemetery. While employed as a [c]ounselor with Fort Lincoln [he] began to experience swelling and pain in [his] knee and ankle but [he] continued to work for five year." (Pls. Mot. 1). He worked as a memorial counselor from 1998 until March of 2003. (R. 147).

Plaintiff falls short in overcoming the ALJ's finding that he is not disabled within the meaning of the Act. First, following Plaintiff's horrific accident, he returned to his job as a maximum security officer. His return was after approximately a year and a half, which included physical therapy. For purposes of determining disability under the Act it is significant that Plaintiff did return to work. Second, following the closing of the Lorton Prison, Plaintiff found a job as memorial counselor at a cemetery. Plaintiff claims that he left this position after five years because the condition with his leg got worse. This is significant because his claim that the condition with his leg deteriorated is contradicted by the medical evidence of the time in question. It is also contradictory to Plaintiff's assertion that due to his literacy issues he is ostensibly unemployable. He concedes that both positions involved a minimal amount of reading and writing. This admission tangentially forecloses Plaintiff's illiteracy argument in the eyes of the ALJ. Further, the ALJ notes that when medication was prescribed, it was on an "as needed" basis, suggesting that the pain was not constant. (R. 18). Plaintiff's own testimony at the hearing contradicts the claims Plaintiff makes in his motion. He testified that he did not always take medication. (R. 50).

Unfortunately for Plaintiff, he did not provided enough evidence to prove to the ALJ that

he is disabled as defined in the Act. Nor did he put enough evidence in the record to call into question the ALJ's conclusions. Thus there is substantial evidence to support the ALJ's decision. Those points will be addressed below.

### A. The Listings

Within the rubric of the Social Security Regulations ("Regulations"), are a set of criteria used to determine if an individual claimant's impairment is such that is renders that individual disabled by definition under the Act. At step three, while a claimant still has the burden of proof, the ALJ must determine whether a claimant's impairment(s) "either severally or in combination, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart p, Appendix 1, which is known as the Listing of Impairments. If one of the [L]istings is met, disability will be automatically found without consideration of age, education, or work experience." Beckman v. Apfel, 2000 WL 1916316, *2 (D. Md. 2000).; See also, France v. Apfel, 87 F. Supp. 2d 484, 498-88 (D. Md. 2000) ("If a claimant's disability meets or equals an impairment found on the [Listing], the claimant is presumed disabled.")

Here, the ALJ notes that Plaintiff's "lower extremity impairment is not evidenced by the requisite joint space narrowing, bony destruction, or ankylosis, as required by [Section 1.02]. Nor has it resulted in an inability to ambulate effectively, as defined in Section 100B2b." (R. 17). Normally, that explanation would not satisfy the substantial evidence threshold without providing a more detailed discussion - of laboratory findings, for example - to support the ALJ's position. However, in this instance the Court cannot fault the ALJ. First, neither at the hearing nor in Plaintiff's Motion is there an assertion that his condition meets or equals a Listing. Standing alone, this would be sufficient. But second, while there is some discussion about Plaintiff's injury and even some noticeable deterioration on an MRI, there is not such evidence

that would require the ALJ to explore the issue further, particularly as Plaintiff is silent. See Huntington v. Apfel, 101 F. Supp. 2d 384, 392 (D. Md. 2000) (noting that when there is no factual or medical support for much of a listing, the ALJ is not required to compare the medical evidence within the record to the criteria of a specific Listing.)

### B. The ALJ's RFC

The RFC assessment is used at step four and five of the sequential process. SSR 96-8P, 1996 WL 374184 * 2 (July 2, 1996). It is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8P, 1996 WL 374184 * 2 (July 2, 1996). The regulations governing RFC assessments state: "Your [RFC] is the most you can still do despite your limitations. We will assess your [RFC] based on all the relevant evidence in your case record." 20 C.F.R. § 404.1545 (a)(1). Therefore, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P, 1996 WL 374184 * 6 (July 2, 1996).

Here, the ALJ found that:

> through the date last insured, the claimant had the [RFC] to perform a range of light, and alternatively sedentary, work as defined in 20 C.F.R. 404.1567(b). He can sit for a total of six hours in an eight-hour workday, and can stand and/or walk for a total of four hours in an eight-hour workday. He requires the option to alternate between sitting and standing such that not more than a half hour is required to either sit or stand at any one time period. As a precautionary measure due to mental limitations, he cannot climb ladders, ropes, or scaffolds; be exposed to hazardous heights or moving machinery; or be exposed to extreme temperature changes. He can occasionally[] climb stairs and ramps, balance[], stoop, and crouch; he cannot kneel or crawl. He cannot perform work that requires the use of push/pull controls with his legs. He has to avoid concentrated exposure to excessive vibration, and avoid excessive humidity or wetness. He requires low-

7

stress work, that is, work requiring no more than moderate[] attention, concentration, and persistence and pace for prolonged periods of time. He has a moderate degree of pain. [He] has moderate limitations as to completing a normal workday and workweek, and as to performing at a consistent pace without an unreasonable length and number of rest periods. The claimant also has moderate limitations as to accepting instructions and responding appropriately to criticism from supervisors, and as to interacting and getting along with coworkers and peers.

(R. 17).

A critical issue in this case involves the issue of pain and the limitations such imposes on Plaintiff. When an ALJ's narrative includes the issue of pain, in this Circuit, it is well-established that an ALJ must follow a two-step process for assessing complaints of pain as set forth in 20 C.F.R. § 404.1529(a). Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). The first step requires the adjudicator to determine whether the evidence indicating a medical impairment "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529 (b). The second step requires the adjudicator to evaluate the intensity and persistence of Plaintiff's symptoms to determine how Plaintiff's symptoms limit his capacity to work. 20 C.F.R. § 404.1529(c)(1). This second step necessarily requires the ALJ to make a determination "about the credibility of an individual's statements about pain." SSR 96-7P, 1996 WL 374186 (July 2, 1996).

In addition to objective medical evidence, the regulations also provide the following factors for consideration when an ALJ is determining Plaintiff's credibility regarding pain. They are: (1) Plaintiff's daily activities; (2) the location, duration, frequency, and intensity of Plaintiff's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications Plaintiff takes or has taken to alleviate her pain or other symptoms; (5) treatment, other than medication, Plaintiff receives or has received for relief of her pain or other symptoms; (6) any measures Plaintiff uses or has used to

8

relieve her pain or other symptoms (e.g., lying flat on her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529 (c)(3)(i)-(vii). See also, SSR 96-7P, 1996 WL 374186 *3 (July 2, 1996).

The ALJ determined that the evidence shows that Plaintiff's medically determinable impairment could reasonably be expected to cause the symptoms he alleges. (R. 19). However, the ALJ also stated that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (R. 19).

1. Activities of Daily Living

In terms of activities of daily living ("ADL"), the Fourth Circuit has said that "[t]he only fair way to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (citation omitted). Here, the ALJ notes that Plaintiff "indicated that he was unable to do much of anything after his problems worsened in approximately May 2007." (R. 18). Plaintiff claimed that after leaving Fort Lincoln "my leg will start swollen up because it required me to do a lot of moving, going back and forth . . . to see families and everything." (R. 47). Plaintiff indicated this worsening condition occurred even before he filed for disability. (R. 47). The ALJ asked in reference to the May of 2007 time frame "what were you able to do in way of activities?" (R. 48). Plaintiff responded "absolutely nothing." (R. 48). Plaintiff noted that "I would have all kind of pains, in my leg and I'd find myself going to a doctor and having to try and elevate my legs so the fluids would go down." (R. 48).

The ALJ indicated that Plaintiff, in 2007, claimed to be able to walk a full block and in

2008 had reduced that to a half block. (R. 48). The ALJ inquired at the hearing as to whether Plaintiff's ability to walk had remained the same or gotten worse. (R. 48). Plaintiff stated: "It depends. If my leg have been swollen all day, I might, I might not even half a block." (R. 49). Throughout the hearing the ALJ inquired about Plaintiff's ability to perform household chores, prepare meals, etc. In general, Plaintiff responded that if his leg was not "swollen" he would try to perform any task that was being asked about. (R. 47-51, 53, 59-61).

Despite these representations by Plaintiff, the ALJ found that Plaintiff was able to independently care for his personal needs and care for his twin children who are nine years old. (R. 19). In addition, the ALJ found that Plaintiff takes public transportation, attends church services and performs light household chores all without the use of a cane. (R. 17). In sum, all of these activities served to diminish the Plaintiff's assertions of total disability in the ALJ's view. The Court finds that this view is supported by substantial evidence.

## 2. Medical Evidence

Plaintiff states that "I started treatment for my leg and ankle and have seen several Doctors and Specialists who have all come to the same conclusion which is, it is impossible to stand for long periods of time due to my injury from the auto accident years ago." (Pls. Mot. 1). While Plaintiff does not point to any portion of the record specifically, this assertion is not completely without merit. On January 5, 2008, Dr. Ajit Kurup performed a consultative exam. (R. 251). Dr. Kurup concluded that Plaintiff was "not in a position to perform activities that require exertion of his right lower extremity especially weight bearing activities such as standing, running, or carrying weights at the present moment." (R. 253). In addition, while Dr. Kurup found that Plaintiff "can sit for prolonged periods of time," Dr. Kurup went on to conclude that Plaintiff "cannot stand for more than 10 minutes or run even a few steps at the present moment."

(R. 253).

    Moreover Dr. Kurup's note states that:

> [Plaintiff] was involved in a motor vehicle accident in 1993 and the right foot was detached at the accident site and was later surgically reconstructed. But the pain persists and has become unbearable. Patient was in tears during my evaluation from pain. He claims the pain to be 8 to 10 on a scale of 10, sharp, located around the right ankle. He walks with a cane. It is associated with swelling and radiates to the popliteal area. Recently the patient was diagnosed with arthritis of the said joint. The patient wants his foot to be amputated for relief from the pain.

(R. 251).

While not medical evidence per se, Plaintiff was asked about how long he could sit before he had to change position. Specifically, Plaintiff stated: "[m]aybe 15, 20 minutes maybe." (R. 60). Plaintiff also claimed that while he does better sitting, sometimes even, then "if I don't have my leg elevated, it creates a discomfort." (R. 60).

The ALJ found Plaintiff's allegations regarding pain not to be fully credible. In reaching this conclusion the ALJ points out that Plaintiff "said he sometimes had problems sitting, and that he could sit for only 15 to 20 minutes before he had to change positions or stand up but as observed at the hearing he exceed[ed] such limits but that is just one of the factors among many considered." (R. 18). The ALJ also asserted that the "evidence shows a relatively infrequent and conservative course of treatment, and certainly does not corroborate the claimant's allegation that he needs to frequently elevate his leg throughout the day and has had to do the same during the period of review." (R. 21). To that end the ALJ noted that "the claimant's [ADL], the medical and other evidence of record, and the findings of the State agency consultants suggest that he can sustain a greater capacity than he described at the hearing." (R. 21). For this reason the ALJ concluded that Plaintiff's "subjective complaints and alleged limitations [were] not fully persuasive." (R. 21).

11

The ADLs appear to serve as the primary deciding factor in the decision. But the ALJ also dedicates a significant portion of the decision covering the medical evidence, which involve the other factors mentioned, either directly or by implication. With specific regard to the medical evidence the ALJ noted the following:

> The medical evidence of record also does not substantiate the claimant's allegations of disabling limitations. As already noted, he underwent a right foot amputation in the 1986-1987 time period, and subsequently returned to work. Although his alleged onset date of disability since March 1, 2003, there is scant medical evidence with respect to that time period, and he alleged at the hearing that his condition actually worsened in approximately May 2007 and not earlier for purposes of the limitations asserted. Note hearing testimony.
>
> Nor does the more recent medical evidence corroborate the claimant's allegations of disabling limitations in his right lower extremity. According to a note from April 2007, he took Tylenol for relief, and his stiffness improved with ambulation. [Ex. 12F page 6]. In May, 2007, he reportedly sought treatment for gastrointestinal complaints, and he was in no acute distress with no lower extremity edema. [Ex. 12F page 5]. Records from September 2007 similarly indicate that he was pleasant and in no acute distress, and only occasionally taking Tylenol for relief. He was advised to follow up a month later. [Ex. 12F page 3-4].

(R. 19).

As previously noted, if the ALJ's decision is supported by substantial evidence, then the Court must afford the ALJ's decision deference, even if the Court does not necessarily agree with the ALJ's determinations. Here, the ALJ's analysis is on solid ground because the claims by Plaintiff in one instance to Dr. Kurup, at times during the hearing and in Plaintiff's Motion are all contradicted by his statements to doctors over time as demonstrated by the ALJ. Further the ALJ included his own observations of Plaintiff at the hearing. Weighing all this evidence the ALJ concludes that Plaintiff's condition did not warrant a finding that he is disabled as defined by the Act. Viewing the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence.

12

## C. Mental Impairments

"An ALJ's discussion of one's mental limitations at step two and three is <u>not</u> an RFC assessment, and therefore does not satisfy the ALJ's duties at step 4 & 5 of the sequential evaluation." SSR 85-16, 1985 WL 56855 *2 (S.S.A.). Here, the ALJ does not specifically identify any mental limitation as a severe impairment at steps two or three. Nevertheless, "[a]ll limits on work related activities resulting from the mental impairment must be described in the mental RFC assessment." SSR 85-16 1985 WL 56855, *2 (S.S.A.)

The evidence of Plaintiff's education and literacy are scant. Both at the hearing and in Plaintiff's Motion, Plaintiff contends he cannot read or write, or at the very least has great difficulty. (R. 55, Pls. Mot.). Besides Plaintiff's self-described limitations, Plaintiff does not present evidence of such.

> [ALJ]: You mentioned that you use, you used a cheat sheet when you worked at the cemetery.
> [Pls.]: Yes, ma'am.
> [ALJ]: What, did you mean by that?
> [Pls.]: That's when . . . if somebody wanted a property over here or this kind of property or more than one, they have a listing, they have a whole book of different contracts that you can write up and you pick the one that the family want and you write it up. If they wanted something that was different that wasn't in that book, one of my supervisors would come out and see them or they would come into the cemetery.
>
> . . .
> [ALJ]: Okay. But you had to have a basic understanding of what those documents represented in terms of reading them to make sure you didn't give them the wrong thing or have them sign the wrong thing?
> [Pls.]: Right, because they have it highlighted in there for one place or either - -
> [ALJ]: Okay
> [Pls.]: - - two places and they will, and with mine, I used, I just did if they had the number written down in letter, I would have a one put on it so I know that's one lawn place or either two. My little cheat sheet was a little different.

(R. 63-64). While this at least presents a colorable argument that Plaintiff does have significant reading problems, it also arguably demonstrates that Plaintiff is not illiterate, or at the

13

very least is capable of reading, albeit at a basic level.[3]

Upon further questioning by the ALJ, Plaintiff conceded that he was able to fill out reports and the like as a prison guard. What exactly is entailed in filling out one of these forms is not part of the record save for Plaintiff's vague description at the hearing. But coupled with the testimony sited above, for the ALJ's purpose, though Plaintiff used a "cheat sheet" and may have compensated in other ways, he was required to read and write in order to perform both jobs. Thus, these examples were sufficient to support the notion that he has a basic ability to read and write. Absent stronger evidence to the contrary, the ALJ's finding regarding Plaintiff's cognitive ability is supported by substantial evidence.

There is some debate as to Plaintiff's actual ability to independently fill out forms and the like. That said, there is no dispute, that at least on one particular form in the record, Plaintiff received assistance from an employee of the Social Security Administration to complete. (R. 42). One possible suggestion is that Plaintiff's ability to read and write was such that he required assistance just to fill out the generally simple form. However, the exact reason for requiring this assistance was never explored. Further, there is no evidence in the record that Plaintiff received assistance in filling out other forms.

Likewise Defendant presumes that Plaintiff wrote Plaintiff's Motion. (Def. Mot. 8). Plaintiff's Motion is silent as to whether it was written by Plaintiff, written by someone else, or that he dictated it and another person typed it on his behalf. However, Plaintiff's Motion does bare his signature so there is at least a rebuttable presumption that Plaintiff did author it. While it is entirely possible that Plaintiff received help in writing the motion, absent some indication to the contrary, it is impossible for the Court to disagree with Defendant absent speculation.

---

[3] The Court notes that the ALJ did not have Plaintiff attempt to read at the hearing. That said, neither did Plaintiff's attorney.

Plaintiff's attorney in her "Representative Brief" stated "[s]ince the school no longer has his special education records including his psychological and national testing, it is respectfully requested that a consultative examination be ordered to test his word recognition and reading comprehension." (R. 230). As counsel aptly pointed out, 20 C.F.R. 404.1519a provides for such under these circumstances. Counsel also asserted that "[i]f [Plaintiff] is limited to sedentary work and is illiterate, he is disabled under Rule 201.17." (R. 230). Counsel's observations are correct. However, the Court notes that the ALJ is not required to order a consultative exam in all circumstances or even upon request. Certainly a consult exam could have been useful in this circumstance and may have aided Plaintiff's cause. But then again it may have been of no assistance at all. Either way, there were other avenues available to Plaintiff to put evidence of his alleged illiteracy or severe difficulty reading into the record.

As the record stands before the Court, there is one document that suggests Plaintiff received assistance in completing it. But there is no evidence in the record by Plaintiff that he in fact received help with the completing that form because of an inability to read and write. Plaintiff could have clarified the point by simply testifying that he required assistance because of his diminished reading ability. In addition, Plaintiff could have also presented witnesses from the cemetery, a past teacher or even a family member, such as his wife, to testify and bolster his assertion about his difficulty reading and writing. Though a consultative examination would have been helpful, and the Court is troubled that the ALJ did not bother to honor Plaintiff's request, a consultative examination was neither required nor the only way for Plaintiff to reach his burden of proof.[4]

There is often tension between an ALJ's discretion and an ALJ's over arching duty to

---

[4] It is worth noting that Plaintiff was represented by an attorney at both hearings. While that relationship ended some time after the second hearing, there is no evidence that Plaintiff was denied a full and fair hearing. Nor has Plaintiff made such an argument.

15

fully develop a record. Just as the ALJ gives particular attention to Plaintiff's medical records, he also specifically addresses Plaintiff's mental capabilities and limitations.

The ALJ's decision specifically states:

> [Plaintiff's counsel] argued that the claimant was disabled under Rule 201.17 as a result of his literacy and right foot amputation, which limited him to sedentary work. She claimed that the claimant was illiterate because he completed the 7th grade in special education, took remedial reading in the 9th grade, and took a life skills course in the 11th grade. However, because his school no longer had his special education records, [Plaintiff's counsel] requested that a consultative psychological examination be ordered pursuant to 20 C.F.R. 404.1519a but the [ALJ] did not find [it] necessary to making a decision based upon the claimant's testimony as to being able to read and understand simple written material and perform sales work as a Memorial Counselor to others as to the internment or burial arrangements and the school records that were provided which both indicated a capacity to read and do some writing. [Ex. 11E].
>
> . . .
>
> As an initial matter, the undersigned as discussed concluded that additional testing of the claimant's mental capacity is not warranted in light of the evidence of record in its entirety, including the claimant's past relevant work as a corrections officer and a memorial counselor, both of which are semi-skilled in nature under the Dictionary of Occupational Titles. Although he alleged at the hearing that he used a cheat sheet to remember what questions to ask as a memorial counselor, he did not deny that he was, in fact, able to do the work and read and understand and take down what the prospective clients desired in the way of arrangements as a Memorial Counselor and that as a corrections officer he had read and understand certain correction forms and fill out the paperwork. There is no evidence that his mental functioning has diminished in any way since that time.

(R. 18-19).

At step 5, the ALJ has the burden of proof. "A particular job may or may not be identifiable in authoritative reference materials. The claimant is in the best position to describe just what he or she did in PRW, how it was done, what exertion was involved, what skilled or semiskilled work activities were involved, etc. Neither an occupational title by itself nor a skeleton description is sufficient." SSR 82-41, 1982 WL 31389 *4 (S.S.A.). However, this is not a case where there are competing descriptions of Plaintiff's past work. There is only one,

either the ALJ accepts it or rejects. If for example, there was actual testimony from someone from the cemetery, or something in the record such as an example of the form Plaintiff actually used, then there might be justification to reject the ALJ's conclusion. However, the ALJ is afforded great deference in administrative matters and in light of the evidence in the record, his conclusion is reasonable.

## V. Conclusion

The Court finds that the ALJ's decision is supported by substantial evidence. Further, Plaintiff has not satisfied his burden of proof. Based on the foregoing, the Court DENIES Plaintiff's Motion and GRANTS Commissioner's Motion.


May 17, 2011 _____/s/_____
Charles B. Day
United States Magistrate Judge


CBD/sm